ALAMO RENT-A-CAR, INC., Appellant, *v.* TERRY and VYONNE MENDENHALL, Respondents.

No. 27451

April 24, 1997                                     937 P.2d 69

*Fitzgibbons & Anderson,* Las Vegas, for Appellant.

*Rawlings, Olson, Cannon, Gormley & Desruisseaux, Las Vegas, for Respondents.*

446

## OPINION

*Per Curiam:*

John C. Clark, under the alias Thomas Pecora, rented a 1994 Lexus from Alamo Rent-A-Car on December 21, 1994. Clark failed to return the car to Alamo and obtained a California "quick title" using forged signatures of fictitious parties. Clark then advertised the car in the Las Vegas Review Journal newspaper and subsequently sold the car to Terry and Vyonne Mendenhall (Terry and Vyonne or the Mendenhalls) for $34,000.00 in cash

on January 9, 1995. The Mendenhalls then made improvements to the car, had it insured, smog and safety tested, registered, licensed, and titled in the state of Utah. Subsequently, on February 24, 1995, Alamo reported the car stolen.

On March 21, 1995, the Nevada Department of Motor Vehicles (DMV) seized the car from the Mendenhalls' possession. The Mendenhalls then sued the DMV (and the towing company that took the car from their home) for replevin of the car. The DMV and the towing company were subsequently dismissed from the lawsuit, and Alamo was substituted as the defendant. Following a bench trial, the district court concluded that the Mendenhalls had purchased the car for value and without notice that it was stolen, and were bona fide purchasers entitled to ownership and possession of the 1994 Lexus. Alamo appeals, claiming that Terry and Vyonne could not have been bona fide purchasers because the thief, Clark, did not have voidable title, and thus had no valid title to pass to the Mendenhalls at the time of sale.

## FACTS

On December 21, 1994, Clark, using the name Pecora, rented a 1994 Lexus sedan from Alamo in San Diego, California; the car was originally due back to Alamo on December 28, 1994. At the time of rental, Clark presented a credit card and driver's license in the name of Pecora; Alamo did not verify the validity of Clark's driver's license. On January 1, 1995, Clark asked to extend the rental agreement until January 4, 1995. Alamo agreed; however, Clark did not return the car on its new due date, and Alamo unsuccessfully attempted to contact Clark.

On January 14, 1995, an individual claiming to be Pecora's employee called Alamo asking for another extension and stating that Pecora would return the car over the weekend. Alamo tried extending the rental contract by using the credit card used by Clark on the initial agreement, but it was declined by the credit card company. On January 18, 1995, Alamo sent a non-certified Western Union Mailgram demanding return of the Lexus to the home address that had been listed by Pecora on the original rental agreement.

On January 26, 1995, the San Diego Alamo rental station received information that security personnel for the Reno Alamo office had been contacted by FBI Agent Brian Coy concerning another Lexus rented under the name Pecora; an individual had attempted to sell this second Lexus to an undercover FBI agent. On that same day, Alamo sent a second, certified demand letter via Western Union Mailgram to Clark at the same address to which the non-certified letter had been sent eight days earlier.

On January 27, 1995, Alamo attempted to verify the validity of the driver's license and credit card used by Clark on the original December rental agreement; Alamo discovered that there were no records of a "Thomas Pecora" and that the credit card number was invalid. On February 6, 1995, both demand letters sent to Clark were returned to Alamo stamped "not at this address." On February 7, 1995, Alamo left a message on the answering machine at the phone number listed by Clark on the rental agreement, demanding return of the car.

Thomas Kringel, the San Diego Alamo office's security specialist, attempted to contact the FBI between February 9 and 15, 1995. On February 15, 1995, Kringel spoke with FBI agent Coy, who allegedly advised Kringel to file a stolen vehicle report with the police. Agent Coy, who first spoke with security at the Reno Alamo office on January 26, 1995, testified that he had never told anyone at Alamo to wait any amount of time before filing a theft report with local law enforcement. On February 24, 1995, Alamo filed a stolen vehicle report with the San Diego Police Department based on Clark's failure to return the Lexus he had rented on December 21, 1994.

It was subsequently learned that Clark had fraudulently re-registered the title to the Lexus in his name. He completed an application for lost title on the Lexus he had rented December 21, 1994, dated December 10, 1994. Apparently, by forging the name of a fictitious person, Clark had filled in the application so that it appeared that the car's lienholder, Nation's Bank of Georgia, had approved the transfer of the car. The document showed that another fictitious person, an alleged agent of Alamo, had also approved the transfer, indicating that the car had been sold at an auction to a "J.C. Clark Enterprises." Clark submitted this application, along with an inaccurate odometer statement, also signed by the non-existent agent of Alamo, to the California DMV; seventy-two hours later, the DMV issued a new California title to J.C. Clark Enterprises. This title was referred to as a "quick title." A car dealer (who was the Mendenhalls' counsel's father-in-law) testified at trial that a "quick title" is a legal document capable of transferring ownership, and is indistinguishable from a standard California title.

Meanwhile, between the time Clark had rented the Lexus and the time Alamo reported the car as stolen, the Mendenhalls had purchased the vehicle. On January 8, 1995, Vyonne had seen a classified advertisement in the Las Vegas Review Journal for a 1994 Lexus sedan. She called the listed number which was answered by a voice mail system, and left a message. A few minutes later Clark (using that name) returned Vyonne's call. Clark said that he lived at a country club and was watching

football play-offs and did not want people coming to his home to look at the car. The Mendenhalls agreed to meet Clark at their home the following morning.

On January 9, 1995, the Mendenhalls test drove the Lexus, and Clark presented his Nevada driver's license and the car's alleged title, which listed "J.C. Clark Enterprises" as the owner, to Terry; the California license plate and the car's vehicle identification number (VIN) matched the California title. Clark agreed to sell the car to the Mendenhalls for $34,000.00, which the lower court found to be approximately $2,000.00 below market value. Clark then left for a brief period of time, and Terry called Toyota and Lexus Financial Services in Sacramento to inquire as to what a valid California "quick title" looked like. Satisfied that the quick title was legitimate, the Mendenhalls decided to purchase the car.

Clark returned, and he and the Mendenhalls drove to the Mendenhalls' bank to get the $34,000.00. Clark told the Mendenhalls that he did not wish to go into the bank, so Terry got the $34,000.00 in cash and Vyonne stayed in the car with Clark. Terry returned with the cash, and Clark offered to re-sign the title. The Mendenhalls said that because the signature on Clark's driver's license and the title matched, he did not need to sign the title again, the $34,000.00 in cash was given to Clark and no receipt was necessary. The Mendenhalls then dropped Clark off at a bar where he said a friend was going to pick him up. Clark gave the Mendenhalls a whole set of keys, apparently more than the keys to the Lexus; when the Mendenhalls got home after dropping off Clark, Vyonne went back to the bar to return the extra keys, but Clark had already left.

Although the Mendenhalls lived in Las Vegas, they had a business in Utah, and two of their other vehicles were registered in that state (their children's cars, who were attending school in Utah). In order to get lower insurance premiums, they registered the new Lexus in Utah on February 9, 1995, after smog and safety testing, insuring, and making $1,628.00 worth of improvements to the vehicle (window tinting, a gold trim package, etc.) through Las Vegas Lexus dealerships. On April 17, 1995, the Mendenhalls received a Utah certificate of title (dated April 4, 1995) on the 1994 Lexus.

However, on March 20, 1995, a representative of the Nevada DMV, Jerry Hafen (Hafen), had run a fifty state check on the Lexus rented by Clark from Alamo in December, 1994, and discovered that it had been registered to the Mendenhalls in the state of Utah. On March 21, 1995, Hafen went to the Mendenhalls' Las Vegas home and seized the 1994 Lexus, impounding it at Quality Towing, Inc.

The Mendenhalls subsequently brought an action for replevin against the Nevada DMV and Quality Towing. The parties were dismissed from the action, and Alamo was added as a defendant. At a bench trial, the lower court concluded that Clark had voidable title to the Lexus, and that the Mendenhalls were bona fide purchasers for value without notice of any outstanding claims. The court further concluded that Alamo was estopped from asserting ownership over the Mendenhalls, citing Alamo's delay in reporting the vehicle stolen between January 26, 1995, when it knew that the vehicle had been stolen, and February 24, 1995, when a police report was filed. Accordingly, the lower court awarded ownership and possession to the Mendenhalls. Alamo appeals this decision, claiming that the Mendenhalls were not bona fide purchasers, and that even if they were, because Clark was a thief, he had no title to pass, voidable or otherwise, even to bona fide purchasers. Alamo further asserts that the doctrine of equitable estoppel was inapplicable on the facts of this case.

## DISCUSSION

*The district court erred in awarding ownership and possession of the 1994 Lexus to the Mendenhalls instead of Alamo*

NRS 104.2403(1) provides in pertinent part:

> A purchaser of goods acquires all title which his trans-feror had or had power to transfer . . . *A person with voidable title has power to transfer a good title to a good faith purchaser for value.* When goods have been delivered under a *transaction of purchase* the purchaser has such power even though:
>
> . . . .
> (c) It was agreed that the transaction was to be a "cash sale"; or
> (d) The delivery was procured through fraud punishable as larcenous under the criminal law.

(Emphasis added.)

On appeal, the primary questions raised are whether Clark had voidable title to the Lexus when he sold it to the Mendenhalls, and whether the Mendenhalls were, in fact, good faith or bona fide purchasers of the car. If either of these questions is answered in the negative, the transfer was void pursuant to NRS 104.2403. As a fallback position, the Mendenhalls argue that even if the transfer was void under NRS 104.2403, Alamo should be estopped from asserting ownership of the Lexus because of its delay in reporting the Lexus as stolen.

We need not reach the issue of the Mendenhalls' status as bona

fide purchasers because we conclude that Clark did not have voidable title. Therefore, even if we assume that the district court properly found the Mendenhalls to be bona fide purchasers, the transfer was void.

*Clark did not have voidable title to transfer to the Mendenhalls*

Upon concluding that the Mendenhalls were bona fide purchasers, the lower court noted that the California "quick title" furnished by Clark "was accepted by the state of Utah as valid and a new registration and license plates were issued" to the Mendenhalls. Both the Mendenhalls and the lower court seem to equate Clark's fraudulently obtained but facially valid California "quick title" with voidable title capable of transferring ownership. The law does not support this conclusion.

Other jurisdictions have considered the effect of a sale by a thief:

> The owner of stolen goods is not divested of title therein by the theft, and even though an innocent subsequent purchaser may be treated as having title as against everyone but the rightful owner, a sale by the thief . . . does not vest title on the purchaser as against the owner . . . .
>
> . . . .
>
> *The true owner may recover a stolen motor vehicle . . . from a good-faith [(bona fide)] purchaser even though the thief had also stolen, or forged a title certificate, or obtained a title certificate in another state and delivered it to the purchaser.*
>
> The fact that the negligence of the owner contributed to or facilitated the theft does not estop the true owner from asserting title.

67 Am. Jur. 2d *Sales* § 447 (1985) (citations omitted) (emphasis added).

Section 2403 of the California Uniform Commercial Code mirrors NRS 104.2403. In Suburban Motors, Inc., v. State Farm, 268 Cal. Rptr. 16, 19 (Ct. App. 1990), the court concluded that "[a]ny title derived from a thief, *despite an authentic certificate of title,* is . . . considered void, not 'voidable' as the term is used in section 2403." (citing 1 White & Summers, Uniform Commercial Code § 3-11 (3d ed. 1988) (emphasis added)). The California court concluded that where a thief stole a car and then obtained a facially valid California title using an altered VIN, a subsequent bona fide purchaser could not claim voidable title because he took

"under a spurious chain of title dependent on 'laundered' title documents." *Id.* at 21. We agree with this case law.[1]

Because Alamo still had possession of the Lexus' title, Clark could not have had voidable title simply by fraudulently obtaining a facially valid California title. Accordingly, the Mendenhalls, even if found to be bona fide purchasers, could not have taken ownership superior to Alamo's pursuant to NRS 104.2403. However, because the Mendenhalls were found to be bona fide purchasers, Alamo must be ordered to reimburse the Mendenhalls for any improvements made to the Lexus while in their possession. *Cf.* Motors Ins. v. State, 437 S.E.2d 555, 557 (S.C. Ct. App. 1993) (holding that where third parties were *not* bona fide purchasers, they were not entitled to reimbursement for improvements, enhancements, or additions made to true owner's vehicle while in their possession).

*Alamo is not equitably estopped from contesting the Mendenhalls' ownership of the 1994 Lexus*

The Mendenhalls argued and the lower court, quoting Godfrey v. Gilsdorf, 86 Nev. 714, 718, 476 P.2d 3, 5-6 (1970), concluded that although both parties were innocent, "ALAMO, due to its inaction in reporting the car stolen '. . . set in motion the chain of events which led to the sale of the car and should bear the loss incurred' " and that "the principle of estoppel precludes ALAMO from asserting its title against MENDENHALL who purchased the vehicle in good faith, for value and without notice of the interest of ALAMO."

In *Gilsdorf,* a seller was estopped to assert title as against a bona fide purchaser where the seller had placed his car with a used car dealer with the intent that the dealer would sell his car to a third party. *Gilsdorf,* 86 Nev. at 718-19, 476 P.2d at 6. *Gilsdorf* is inapposite here because Alamo did not entrust its car to Clark

---

[1]This issue of whether a thief can convey voidable title is one of first impression in Nevada. Cooper v. Pacific Automobile Insurance, 95 Nev. 798, 603 P.2d 281 (1979), is not on point. In *Cooper,* an original owner/seller *gave title* to a buyer who purchased the car with an invalid cashier's check. Thus, the buyer had fraudulently obtained the vehicle from the owner, as did Clark; however, the owner had actually transferred the vehicle's title to the buyer. The buyer then sold the car, with its title furnished by the original owner, to a third party. The third party was found not to be an innocent, bona fide purchaser and, thus, could not prevail over the original owner; however, the court implicitly found that the original buyer (who had used an invalid check) did have voidable title. *Cooper,* 95 Nev. at 801, 603 P.2d at 283.

for the express purpose of having it sold to a third party. Moreover, to invoke the doctrine of estoppel, a party must prove four elements:

> [T]he party to be estopped must have been aware of the facts; it must have intended that its act or omission be acted upon, or act in such a manner that the party asserting estoppel had a right to believe that it so intended; the party asserting estoppel must have been unaware of the true facts; and it must have relied upon the other party's conduct to its detriment.

McKeeman v. General American Life Ins., 111 Nev. 1042, 1050, 899 P.2d 1124, 1129 (1995).

In the instant case, all four elements of estoppel have not been established. First of all, on January 9, 1995, the date that the Mendenhalls purchased the Lexus from Clark, Alamo did not know that its property had been stolen. Moreover, even if it did know, the San Diego police required that Alamo send a certified demand letter to Clark, and wait ten days before filing a stolen vehicle report. Secondly, Alamo did not, merely by renting a car to Clark, act in such a manner as to induce the Mendenhalls to buy the car (*contra, Gilsdorf,* where the owner gave his car to a dealer to secure a buyer). Finally, assuming that the third element of estoppel (the Mendenhalls had no knowledge of the true facts) has been satisfied, the Mendenhalls could not show detrimental reliance on Alamo's conduct (i.e., failing to report the vehicle stolen before February 24, 1995).

Although the Mendenhalls made some inquiry before purchasing the car (e.g., calling Lexus Financial Services to inquire as to the appearance of a valid California title, comparing signatures on Clark's Nevada driver's license with that on the title, verifying that license plate and VIN were consistent with title), none of these inquiries could have yielded any information which would have been available from a timely filed stolen vehicle report. Thus, even if Alamo had filed a stolen vehicle report by January 9, 1995, the Mendenhalls would not have found out about it, and would have still given $34,000.00 to Clark in exchange for the Lexus.

On these facts, we conclude that it was error for the trial court to conclude that Alamo was estopped from asserting its superior ownership in the Lexus.

## CONCLUSION

Because the trial court could have, based upon competent evidence, ruled either way on the issue of whether the Mendenhalls were bona fide purchasers, we defer to its ruling

thereon. However, the district court erroneously determined that Clark had voidable title. Therefore, ownership remained in Alamo, and Alamo was not estopped from asserting its rightful ownership. Accordingly, we reverse the district court's judgment and remand with instructions to award ownership and possession to Alamo and order Alamo to reimburse the Mendenhalls for improvements made to the Lexus while it was in their possession.